898 A.2d 590 (2006)
PENNSYLVANIA DEPARTMENT OF GENERAL SERVICES, Pennsylvania Department of Transportation, Pennsylvania Public Utility Commission, Pennsylvania Emergency Management Agency, and Pennsylvania Department of State,
v.
UNITED STATES MINERAL PRODUCTS COMPANY, Certainteed Corporation, Courtaulds Aerospace, Inc., Chemrex, Inc., Philips Electronics North America Corporation, Advance Transformer Company, and Monsanto Company.
Appeal of Monsanto Company.
Pennsylvania Department of General Services, Pennsylvania Department of Transportation, Pennsylvania Public Utility Commission, Pennsylvania Emergency Management Agency, and Pennsylvania Department of State, Appellants,
v.
United States Mineral Products Company, Certainteed Corporation, Courtaulds Aerospace, Inc., Chemrex, Inc., Philips Electronics North America Corporation, Advance Transformer Company, and Monsanto Company, Appellees.
Supreme Court of Pennsylvania.
Argued May 11, 2004.
Decided May 25, 2006.
*592 Kim Kocher, Esq., Thomas M. Goutman, Esq., Joseph H. Foster, Esq., Richard A. Sprague, Esq., David E. Sandel, Jr., Esq., Geoffrey Richard Johnson, Esq., Philadelphia, for Monsanto Company.
Louis C. Long, Esq., for amicus curiae Pennsylvania Defense Institute.
Brian S. Montag, Esq., Catherine A. Trinkle, pro hac vice, James A. Henderson, Esq., pro hac vice, Aaron D. Twerski, Esq., pro hac vice, Michael Allen Sarfert, Esq., for amicus curiae Senators Piccola, Thompson, Earll, Corman et al.
Arlin M. Adams, Esq., Philadelphia, for amicus curiae The American Tort Reform Assoc. & Citizens Against Lawsuit Abuse.
Nancy J. Kippenhan, Esq., Daniel J. Doyle, Esq., Kenneth B. McClain, Esq., James M. Ziegler, Esq., Thomas W. Henderson, Esq., Tybe Ann Brett, Esq., William R. Caroselli, Harrisburg, for Pennsylvania Department of General Services et al.
*593 Louis C. Long, Esq., for amicus curiae Pennsylvania Defense Institute.
Nancy J. Kippenhan, Esq., John G. Knorr, Esq., Daniel J. Doyle, Esq., Thomas W. Henderson, Esq., Kenneth B. McClain, Esq., James M. Ziegler, Esq., D. Michael Fisher, Esq., Susan Jane Forney, Esq., Tybe Ann Brett, Esq., William R. Caroselli, Harrisburg, for Pennsylvania Department of General Services et al.
Kim Kocher, Esq., Thomas M. Goutman, Esq., Joseph H. Foster, Esq., Richard A. Sprague, Esq., David E. Sandel, Jr., Esq., Geoffrey Richard Johnson, Esq., for Monsanto Company.
Brian S. Montag, Esq., Catherine A. Trinkle, pro hac vice, Aaron D. Twerski, Esq., pro hac vice for amicus curiae Pennsylvania Chamber of Business and Industries.
BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN, and BAER, JJ.

OPINION
Justice SAYLOR.
In this direct appeal, Monsanto Company challenges a product liability verdict entered against it, arising from the presence, throughout a Commonwealth building, of chemicals that it manufactured.
On June 16, 1994, a fire occurred on the sixth floor of the Transportation and Safety Building (the "T & S Building" or the "Building"), a twelve-story office tower that was located on the campus surrounding the state Capitol in Harrisburg. The Building housed, inter alia, offices of the Pennsylvania Department of Transportation ("PennDOT"), Public Utility Commission (the "PUC"), Emergency Management Agency ("PEMA"), and Department of State, with PennDOT being the principal occupant of office space. In the aftermath of the fire, the presence of polychlorinated biphenyls ("PCBs"), a class of synthetic chemicals, was detected on surfaces and in ambient air inside the Building. Although in the weeks that followed Building occupants were permitted to return to all floors but the four that were most directly affected by the fire, the Commonwealth implemented ongoing, protective health and safety measures, including extensive monitoring of PCB levels throughout the structure. Ultimately, a decision was made to demolish the Building at least in part due to the presence of PCBs, and it was imploded in 1998 and replaced with a new office tower designated as the Keystone Building.
In 1996, the Pennsylvania Department of General Services ("DGS"), PennDOT, the PUC, PEMA, and the Department of State (collectively "Appellees"),[1] commenced the present civil action in the original jurisdiction of the Commonwealth Court, see 42 Pa.C.S. § 761(a)(2), asserting causes of action grounded in strict liability and negligence and seeking compensation for property damage alleged to have resulted from the PCBs. The action was originally lodged against United States Mineral Products Company ("U.S. Mineral Products"), since it apparently initially was believed that asbestos-containing fireproofing manufactured by that company and installed in the Building was the source of the PCBs, and the proceedings were consolidated with a pending action by DGS and PennDOT against U.S. Mineral Products for damages relative to planned abatement of the asbestos hazard. U.S. *594 Mineral Products contended, however, that other building materials were the source of the PCBs, and Appellees sought and obtained leave to join as defendants the PCB manufacturer, appellant Monsanto Company ("Monsanto"), as well as the manufacturers and installers of PCB-containing products found in the Building.
Monsanto unsuccessfully pursued summary judgment on various grounds,[2] and trial commenced in May of 1999, with jurors selected from the Philadelphia common pleas court's jury pool. Appellees pursued damages in excess of $200 million on theories which included a $135 million claim derived from the construction expenses associated with the Keystone Building, as well as various claims for damages to personal property.
On May 26, 2000, after the close of the evidence, Monsanto moved for a directed verdict. Monsanto's motion was granted relative to Appellees' claim for compensation for the loss of certain categories of personal property, but was denied in all other respects. The case was submitted to the jury solely on a strict liability theory.
In August of 2000, by a ten-to-two vote, the jury returned a $90 million verdict against Monsanto, without specification of the particular damages theories and/or claims that were accepted. Monsanto filed motions for post-trial relief and a mistrial. The latter request was based upon comments of the jury foreman during deliberations, in which he told other jurors that his brother suffered from cancer and that the foreman believed this was caused by Monsanto's PCBs. The trial court denied the motions in a published opinion. See Commonwealth, DGS v. United States Mineral Products Co., 809 A.2d 1000 (Pa.Cmwlth. 2002). The court molded the verdict to include an award of $14,528,825 in delay damages, which were calculated from the date that Monsanto was served with the complaint and predicated on the amount of the verdict after it was reduced by approximately one-half pursuant to the terms of a joint tortfeasor release which Appellees executed in favor of a co-defendant based on a settlement. See Reproduced Record ("R.R."), at 123a-24a. With these adjustments, the trial court entered judgment in the amount of $59,528,825 against Monsanto.
Monsanto then filed the instant direct appeal, renewing several of the challenges raised in the trial court and further arguing that delay damages should not have begun to accrue until one year after it was served with the complaint. Appellees filed a cross-appeal, contending that the delay damages should have been assessed on the entire verdict rather than the reduced figure. This Court remanded the case to the trial court for the preparation of an opinion specifically addressing the juror misconduct issue, which had not been covered in the court's original opinion.
By way of further background, several overarching themes run through the parties' presentations. Monsanto, for its part, portrays the T & S Building as a maintenance-starved, asbestos-infested, fire-ravaged structure, which, independent of any involvement of PCBs, required enormous rehabilitative efforts and expenditures. Monsanto highlights the Commonwealth's pre-fire failure to accede to repeated requests from Harrisburg officials to install a sprinkler system in the Building to bring it into compliance with the local fire safety code; the consequence of such failure in terms of prolonging the June-1994 fire; the impact of the fire in terms of generating the contamination by consuming, inter *595 alia, PCB-containing building products, which were assertedly spread throughout the Building in the resultant smoke and soot; the consequences of the fire in terms of its exponential magnification of the Commonwealth's existing difficulties in addressing Building issues; and the Commonwealth's steadfast and extensive downplaying of the significance of the PCB presence in the Building prior to the commencement of the present lawsuit.[3] Monsanto also criticizes the case that Appellees were permitted to present to the jury as lacking in foundation and as distorted by extensive and persistent overreaching. Indeed, Monsanto casts Appellees' efforts to assess it with liability for the destruction of the Building and various of its contents based upon the presence of trace amounts of PCBs as nothing more than a transparent attempt to shift the Commonwealth's own financial responsibility to a deep-pockets defendant. Several amici curiae, including a number of Pennsylvania legislators, also characterize the litigation as an example of lawsuit abuse, perpetrated by arms of the Commonwealth.
Appellees, on the other hand, regard the verdict as a just consequence of Monsanto's manufacture and distribution of dangerous chemicals, which are classified as probable human carcinogens, have the tendency to bioaccumulate in the environment and in humans, and have been banned by Congress since 1976. Appellees acknowledge the role of the fire in terms of its leading to the discovery of the chemical contamination, but contend that Monsanto is liable nonetheless, since a fire is a foreseeable event. Moreover, Appellees high-light their presentation of evidence to the effect that PCBs used as a component of certain of the Building's ductwork were spread throughout the structure through heating and ventilation over the course of its thirty-year life span via "off-gassing" or volitization and dispersal through the air system. Although Appellees acknowledge that occupied portions of the Building were managed in such a way as they remained safe during the period of reoccupancy, there was no question that PCB remediation was necessary, and Appellees rely primarily on the anecdotal experience with cleaning efforts in the Building and other contaminated structures as suggesting that the extraordinary measures taken (including implosion and replacement) were essential to ensure a satisfactory result. Appellees also take issue with Monsanto's characterization of the condition of the Building as decrepit, asserting that most Building issues other than the PCB and asbestos contamination were capable of being addressed through manageable maintenance and repair efforts far short of what was required to remedy the PCB contamination. They maintain that they met their burden of proof with respect to each and every element of their product liability claim seeking compensation for property damage and argue that, under the guise of advancing legal claims, Monsanto truly seeks nothing more than for this Court to reweigh the evidence and inappropriately supplant the role of the jurors as fact finders.
In this landscape, Monsanto presents its challenge to the verdict within a framework of five categories of asserted error, *596 centered on: the trial court's decision to permit Appellees to pursue a replacement cost damages claim relative to the Building; Appellees' advancement of a strict liability theory; the sufficiency of Appellees' proofs as to causation; the trial court's refusal to grant a mistrial based on the jury foreman's conduct; and the award of delay damages measured from the date that Monsanto was served with the complaint, rather than one year after service. Monsanto has styled all of its claims as assertions of legal error, as to which our review is plenary.

I. Replacement Cost Damages
As its lead issue, Monsanto contends that the trial court erred in submitting to the jury Appellees' $135 million building replacement cost claim.
In Pennsylvania, the general measure of damages for permanent harm to real property is the diminution in market value attributable to the conduct, product, or instrumentality giving rise to liability, and in situations in which the harm is reparable, damages are assessed according to the lesser of the cost of repair or the market value of the affected property. See Lobozzo v. Adam Eidemiller, Inc., 437 Pa. 360, 369 & n. 6, 263 A.2d 432, 437 & n. 6 (1970).[4] At trial, however, Appellees relied on a prevailing exception to the general rule reflected in Department of Transportation v. Estate of Crea, 92 Pa. Cmwlth. 242, 483 A.2d 996 (1977), in which the Commonwealth Court authorized utilization of an unbounded replacement cost figure as a measure of damages in a situation in which a defendant/motorist negligently drove his automobile into the superstructure of a public bridge, causing it to collapse. See id. at 253, 483 A.2d at 1002. The trial court accepted this theory, quoting the Crea court's reasoning, as follows:
[A]s value in the commercial sense is determined by the market demand for the thing valued, Sechrist v. Bowman, 307 Pa. 301, 161 A. 332 (1932), the application of such a damage formula to property in the public domain, such as a bridge forming a part of a highway system, cannot possibly fulfill its purpose of compensating the injured party for the actual loss sustained. The `value' of such a bridge regardless of its age, condition and other circumstances cannot possibly be determined for want of any such value in the market place. Any attempt to so value it would be wholly speculative, the very pitfall to be avoided in proof of damages.
U.S. Mineral Products, 809 A.2d at 1001; see also Crea, 92 Pa.Cmwlth. at 253, 483 A.2d at 1002 (reasoning that anything less than the reasonable cost of replacement by a similar structure consistent with current standards of design would not compensate the owner for the actual loss).
*597 The trial court rejected Monsanto's argument that Crea's holding should be confined to situations involving highly unique structures such as bridges, as to which there are no willing buyers and sellers. Although it acknowledged that Monsanto presented evidence that the T & S Building had an ascertainable market value in the Harrisburg commercial real estate market, the court relied on Appellees' evidence that the Building was part of the Capitol complex, and that legislative approval would be required before the T & S Building could be sold, in holding that the Crea exception should apply. See DGS v. U.S. Mineral Products, 809 A.2d at 1014. According to the trial court, these factors would support a jury finding that the T & S Building had no value in the commercial sense and that the proper measure of damages, therefore, was its replacement cost. See id. Over Monsanto's objection, the trial court charged the jury, in relevant part, as follows:
You have heard evidence of the costs incurred by the plaintiff to build the new Keystone Building as a replacement for the demolished Transportation & Safety Building. If you find that the T & S Building was a total loss, damages are to be measured either by its market value or its special value to the plaintiff, whichever is greater. The T & S Building was operational, albeit it had inadequacies. Consequently, you may determine that it had a value to the plaintiff regardless of its market value. In order to recover replacement costs, plaintiff must prove, in addition to all of the things that I have already instructed you, on [sic] these additional elements[:]
* * *
[F]irst that PCBs could not have been cleaned up to a level safe for occupancy and, second, that the T & S Building was unique and totally incapable of commercial appraisal.
N.T., August 10, 2000 (morning), at 105-07.
Presently, Monsanto's primary argument on this point is that the trial court's authorization for Appellees to proceed on a $135-million replacement cost theory predicated on the Commonwealth's construction of the new Keystone Building (described by Monsanto as state-of-the-art), constituted an unprecedented authorization of a windfall, particularly in light of the post-fire condition of the T & S Building independent of the PCB involvement. See Brief of Appellant at 26-34. Characterizations aside, we agree with Monsanto's central contention in this regard.
In the first instance, to the extent that Crea accepts the principle that special-purpose property may be not be amenable to conventional market-valuation assessment, and therefore, utilization of some alternate methodology may be appropriate in determining due compensation for associated loss or destruction, it is consistent with the law of this and other jurisdictions to the effect that an injured plaintiff should not be deprived of fair recompense merely because there is some degree of uncertainty associated with the calculation of damages. See, e.g., Smail v. Flock, 407 Pa. 148, 154, 180 A.2d 59, 62 (1962).[5]See generally John W. Reis, Measure of Damages in Property Loss Cases, *598 76-OCT FLA. B.J. 32, 37 & n. 30 (2002) (collecting decisions from other states).[6] What is remarkable about Crea is the court's decision to dispense with any allowance for pre-loss depreciation to account for the increased benefit that would inure to the plaintiff upon an award of the replacement expense.[7] Such an approach conflicts with this Court's long-standing case authority which recognizes the role of depreciation in the assessment of fair compensation, and correspondingly, in the avoidance of windfall recovery. See, e.g., Jones v. Monroe Elec. Co., 350 Pa. 539, 544, 39 A.2d 569, 571 (1944) (indicating that unremediable damages to a building are calculated based on "actual value of the building itself, taking into consideration its age, condition, and any other circumstances affecting it" (emphasis added)); Romesberg, 385 Pa. at 39, 122 A.2d at 54; accord 22 AM.JUR.2D DAMAGES § 225 (2004).[8]
*599 As Appellees observe, the rationale justifying assignment of an enhanced role to building costs in special-use cases hinges on the recognition that, in the absence of comparable properties in the marketplace or income generated by the property in question, construction costs may be the only reasonably available indicator of value. Analogously, this circumstance also helps to explain the import of the cost approach to market valuation, which, although generally regarded as one of the least reliable indicators of value, remains a well-recognized guide in real estate appraisal. See generally Sullivan, Valuation of Structure Based on Reproduction or Replacement Cost, 8 AM.JUR. PROOF OF FACTS 2D at 406. Significantly, however, as with all other approaches to market valuation, pre-loss depreciation is taken into account in the application of this methodology. See id. at 429 (observing that, in spite of difficulties, "it seems undisputed that in appraising property by the cost approach the appraiser must always consider depreciation"); accord RESTATEMENT (SECOND) OF TORTS § 911, cmt. e (1956) ("Even when the subject matter has its chief value in its value for the use by the injured person, if the thing is replaceable, the damages for its loss are limited to replacement value, less an amount for depreciation." (emphasis added)).
There are decisions in other jurisdictions that reflect that, where replacement or reproduction costs are not wholly unreasonable relative to the pre-loss condition of the property, it may not be necessary to specifically account for depreciation in a special-purpose property case; this may be one way to read Crea; and we need not proceed further in this case to evaluate Crea's correctness as applied to the facts that were presented to the intermediate appellate court in that case. Rather, we hold that Crea's approach of foregoing an adjustment to replacement cost to account for depreciation cannot be fairly transported to the present setting involving the replacement of a thirty-year-old office tower in the condition of the T & S Building to a new, materially different, and substantially improved structure.[9]
We do recognize the difficulty of quantifying depreciation in a situation in which there is little or no market for a property, since depreciation is conventionally understood in terms of the impact of factors such as wear and obsolescence on the price that prospective purchasers would be willing to pay. See supra note 7. Once the abstract figure of replacement or reproduction costs is presented as an indicator of value, however, we find it preferable to require consideration of an analogously abstract depreciation figure over simply disregarding (or permitting a jury to disregard) *600 material considerations such as obsolescence, deterioration, damage, and similar matters that may confront owners of an aged structure.
In summary, while this Court has rejected fixed and formulaic rules when it is determined that they are not setting an appropriate, compensatory standard, see, e.g., Incollingo v. Ewing, 444 Pa. 263, 308, 282 A.2d 206, 229 (1971), and there are many nuances and significant latitude associated with valuation for the purpose of calculating damages, in this case we conclude that, by authorizing the award of damages for property loss based solely upon raw replacement costs, the trial court erroneously extended the range of permissible damages outside the realm of fair compensation.

II. Strict Liability
In addition to the above, we find that Monsanto has identified a second fundamental defect in the verdict requiring, at a minimum, a new trial on both liability and damages. At trial, Monsanto maintained the position that the jurors should be admonished to distinguish between PCB contamination resulting from the June-1994 fire, and contamination resulting from ordinary use of the PCB-containing building materials. For example, Monsanto proposed the following jury instructions:
Under Pennsylvania law, a product is "defective" if it was unsafe for its intended use when it left the manufacturer's control. The manufacturer of a product is not liable for damages caused by an abnormal use of the product.
Under Pennsylvania law, subjecting a product to a fire is an abnormal use, not an intended use, of a product. If you find that, without the fire, the products in question would not have made the T & S Building unsafe, then you cannot find that the products were defective for their intended use when sold.
* * *
An unintended use, even if foreseeable, will not render a product defective. In other words, the manufacturer will not be liable for damages resulting from an unintended use, even if that unintended use, as well as the danger inherent in such unintended use, was foreseeable. A product manufacturer is not liable for unsafe conditions caused by unintended uses of its product, no matter how foreseeable that unintended use may have been.
Proposed Jury Instructions of Defendant Monsanto Company, at 23, 26. Monsanto's entreaty for the court to distinguish between the fire-related and other contamination, however, was rejected. Indeed, as reflected in the trial court's opinion, the instructions given to the jurors explicitly or implicitly authorized them to evaluate the evidence to determine whether the fire could be considered to have been a reasonably foreseeable event against which Monsanto should have guarded. See U.S. Mineral Products, 809 A.2d at 1019.
This was error. As noted, the case was tried solely under a strict-liability theory. In such actions, this Court has held that a manufacturer can be deemed liable only for harm that occurs in connection with a product's intended use by an intended user; the general rule is that there is no strict liability in Pennsylvania relative to non-intended uses even where foreseeable by a manufacturer. See Phillips v. Cricket Lighters, 576 Pa. 644, 656-57, 841 A.2d 1000, 1007 (2003) (plurality opinion authored by Cappy, C.J., with Castille, J., Newman, J., Saylor, J., and Eakin, J. concurring on this point); accord id. at 674-75, 841 A.2d at 1018 (Saylor, J., concurring); id. at 682-83, 841 A.2d at 1023 *601 (Newman, J., concurring and dissenting).[10] The Court has also construed the intended use criterion strictly, holding that foreseeable misuse of a product will not support a strict liability claim. See id.
We acknowledge that it is reasonably foreseeable that building materials may be subject to consumption in a fire, and therefore, an argument can be made that safety for an intended use as building materials should be deemed to encompass their safety in the event of accidental combustion.[11] As directed to the strict liability arena, however, such an argument contravenes the strong admonition of the lead opinion in Phillips (echoing prior decisions of the Court) to the effect that foreseeability considerations have no place in the setting, see Phillips, 576 Pa. at 656, 841 A.2d at 1007,[12] as well as the position of the three-Justice concurrence that, given the conclusion of those Justices that there are substantial deficiencies in present strict liability doctrine, it should be closely limited pending an overhaul by the Court. See id. at 674-75, 841 A.2d at 1018 (Saylor, J., concurring).
In her concurring and dissenting opinion, Madame Justice Newman posits that the Court should extend the liability without fault of manufacturers, beyond the realm of injuries occasioned in the actual course of the use of a product as the manufacturer intended, to injury or damage occasioned by exposure of a product to some unintended but reasonably foreseeable condition of use or "outside cause or instigator." See Concurring and Dissenting Opinion, op. at ___, ___, ___-___, ___, 898 A.2d at 615, 617, 618-19, 619. Justice Newman reasons that strict liability should thus reach increased or enhanced harm occasioned by contamination due to the accidental combustion of a product, and apparently a broad range of other injuries occasioned by all other undefined conditions of use and/or outside causes or instigators such as can be deemed reasonably foreseeable. See id. at ___, ___, ___-___, 898 A.2d at 615, 617, 618-19. Justice Newman bases this position primarily on the present acceptance of crashworthiness doctrine in Pennsylvania. See id. at ___-___, 898 A.2d at 617-19. The position suffers from several facial difficulties, however.
Initially, crashworthiness doctrine has developed as a discrete facet of product liability jurisprudence, having particularized elements requiring the fact finder to distinguish non-compensable injury (namely, that which would have occurred in a vehicular accident in the absence of any product defect) from the enhanced and compensable harm resulting from the product defect. See generally Kupetz v. Deere & Co., 435 Pa.Super. 16, 26-27, 644 *602 A.2d 1213, 1218 (1994). In the present case, however, the trial court gave no particularized instructions to jurors concerning increased harmthe jury was in no way required to distinguish between the injury occasioned by smoke-and-soot contamination in general and that occasioned by PCBs; in fact, on the causation issue, the jurors received only a general substantial-factor charge. See N.T., August 10, 2000, at 92. Therefore, regardless of the merits of the theoretical position set out in the responsive opinion, its conclusion that the existing liability verdict should be sustained on a theory constructed upon the crashworthiness precept is tenuous at the outset.[13]
More fundamentally, Justice Newman's position is premised on the notion that Phillips' lead opinion failed to garner a majority vote for the proposition that negligence concepts, such as foreseeability, have no place in strict liability doctrine. See Concurring and Dissenting Opinion, op. at ___, 898 A.2d at 615 (observing that "ultimately, there was no Majority [in Phillips] to conclude that foreseeability considerations never have a place in a strict liability case."). The reasoning is apparently that, if resort to the negligence-based concept of foreseeability can at least ostensibly be characterized as collateral to the express intended-use requirement,[14] it is not excluded from the strict liability context by actual precedent, given Phillips' plurality status on the broader point. While Justice Newman's threshold proposition may be accurate as concerns Phillips, it fails to account for prior majority decisions of this Court that have based their holdings squarely on the proposition that negligence concepts have no place in strict liability doctrine. See, e.g., Kimco Dev. Corp. v. Michael D's Carpet Outlets, 536 Pa. 1, 7-9, 637 A.2d 603, 606-07 (1993) (predicating a holding that manufacturers may not assert a comparative negligence defense in strict liability cases on the notion that negligence concepts do not properly extend into the strict liability arena).[15]
*603 Furthermore, as previously indicated, a majority of Justices in Phillips acknowledged that there were existing exceptions to the general rule against the importation of negligence concepts and affirmatively grounded their dispositive votes on the reasoning that there should be no further exceptions. See supra. While Justice Newman indicates that she is not proposing a new exception or an extension of an existing one, we are of the view that the metamorphosis of the particularized crashworthiness doctrine into a generalized conditions-of-use/outside-cause-or-instigator exception to the bar against resort to foreseeability concepts in the strict liability arena would, in fact, represent an extension of the type that was disapproved by a majority of Justices in Phillips.
We recognize that, at an abstract theoretical level, Justice Newman's position is not unreasonable, just as the position is not unreasonable that the overall concept of intended use should include all reasonably foreseeable uses and/or occurrences, as a number of other courts have held. See, e.g., Pacheco v. Coats Company, Inc., 26 F.3d 418, 422 (3d Cir.1994) ("We have held that the intended use of a product `includes all those which are reasonably foreseeable to the seller." (quoting Sheldon v. West Bend Equip. Corp., 718 F.2d 603, 608 (3d Cir.1983))). The primary difficulty with importing the foreseeability concept into existing strict liability doctrine in a generalized fashion in Pennsylvania, as Justice Newman proposes, is that central tenets of such liability scheme have been constructed on the contrary notion that negligence concepts are foreign to it. For example, in Kimco, the Court relied directly on the position that negligence concepts have no place in strict liability theory to justify substantial restrictions on use-related defenses in strict liability cases, by prohibiting manufacturer defendants from pursuing a comparative negligence defense based on the plaintiff's conduct. See Kimco, 536 Pa. at 7-9, 637 A.2d at 606-07.[16] It would be incongruous to constrain manufacturer resort to use-related defenses based on the logic that negligence concepts have no place in strict liability cases, while at the same time expanding the scope of manufacturer liability without fault in a generalized fashion using the negligence-based foreseeability concept, as Justice Newman proposes.[17]
*604 In summary, too much of Pennsylvania's scheme of liability without fault has been fashioned on the notion that negligence-based concepts have no place in strict liability to permit a generalized conditions-of-use/outside-cause-or-instigator exception at this juncture in the history of Pennsylvania product liability jurisprudence. Moreover, consumers are protected by the availability of negligence theory to vindicate meritorious design-defect claims that are grounded in negligence concepts, and in this setting, disputes may be resolved on a level field, as defendants may avail themselves of established negligence-based defenses. We thus reiterate that the two lines of reasoning applied by a majority of Justices in Phillips to reach a common holding apply to foreclose a generalized conditions-of-use/outside-cause-or-instigator exception to the bar against resort to negligence-based precepts within the strict liability scheme as it presently exists in Pennsylvania.
As it is undisputed that the incineration of building products is not a use intended by the manufacturer, under prevailing Pennsylvania law, damages in strict liability are unavailable for the fire-related contamination. The absence of any requirement for the jurors to distinguish between the fire- and non-fire-related contamination brings the entire verdict on liability and damages into question, since it cannot be determined whether or not the jurors accepted Appellees' off-gassing theory of PCB dispersal, see N.T., May 19, 1999, at 207-224, accord N.T., November 12, 1999, at 93, 114-15, or Monstanto's evidence that the spread of PCBs throughout the Building resulted from the fire, and therefore, no liability without fault could ensue. In such situation, a new trial is due. See generally Harman ex rel. Harman v. Borah, 562 Pa. 455, 467, 756 A.2d 1116, 1122 (2000) (articulating the governing standard of review requiring the award of a new trial where the trial court has committed an abuse of discretion or error of law that may have affected the verdict).

III. Judgment Notwithstanding the Verdict
As noted, as an alternative to its request for a new trial, Monsanto seeks a determination that the trial court erred by failing to award judgment notwithstanding the verdict in its favor. Such an award is appropriate only if, reading the record in the light most favorable to Appellees as the verdict winners, and affording them the benefit of all reasonable inferences, we would conclude that there is insufficient, competent evidence to sustain the verdict. See Adamski v. Miller, 545 Pa. 316, 319, 681 A.2d 171, 173 (1996). Monsanto's arguments in this regard center on asserted defects in Appellees' strict liability case (including and in addition to the inappropriateness of strict liability for the fire-related contamination), and challenges to Appellees' damages theories.

*605 A. Strict Liability
Monsanto argues that Appellees' evidence of an increased risk of harm to human health caused by PCBs was inadmissible and insufficient as a matter of law, because Pennsylvania law sharply circumscribes claims based upon an increased risk of future injury. See Brief of Appellant at 54-55. In this respect, Monsanto cites to cases in which actual damages for increased risk to human health were sought. See, e.g., Simmons v. Pacor, Inc., 543 Pa. 664, 674 A.2d 232 (1996). As Appellees maintain, however, such decisions have limited relevance to claims predicated on loss or harm to property resulting from chemical contamination, since the problems associated with proving factual causation in bodily-injury cases simply do not arise in this context. We have little difficulty concluding that increased risk of future harm to Commonwealth employees and the general public as a result of contamination attributable to a defective product is directly relevant and an essential consideration in the calculus of those responsible for public venues and other places of human occupancy, and that reasonable remediation efforts directed to protecting against such harm may be compensable in a strict-liability, property-damage case.
Monsanto also contends that Appellees only presented evidence of PCB levels in the Building that were below all binding federal regulatory standards, and thus, the structure was safe for human occupancy under governing law. See, e.g., Brief of Appellant at 54. This claim is factually inaccurate, however, since Appellees presented testimony to the effect that sampling results showed PCB levels above the binding federal standards in various times and locations.[18] The evidence taken in the light most favorable to Appellees is that, in the aftermath of the fire and following the discovery of PCBs, the Building was extensively managed, including the implementation of substantial restrictions on access to space and various building systems, to maintain its safety for human occupancy pending a directed and comprehensive remediation effort. See, e.g., N.T., June 10, 1999, at 38 (testimony of a former PennDOT secretary to the effect that the agency was "doing business in a building shrinking around us").
Furthermore, Monsanto contends that Appellees' substantial reliance at trial on a standard designed to quantify a limit for maximum safe exposure advanced by the National Institute for Occupational Safety and Health ("NIOSH"), a non-binding recommendation by a federal research body, as contrasted with binding regulations of the Environmental Protection Agency and Occupational Safety and Health Administration allowing for higher PCB levels in the workplace setting, undermines the sufficiency of Appellees' proofs. See Brief of Appellant at 57-58. However, Appellees offered expert testimony to the effect that the NIOSH standard was the correct one to ensure safe occupancy.[19] Additionally, Monsanto has limited the questions presented in this appeal to matters of law; it has not advanced a cognizable attack on the trial court's decision to admit the expert testimony endorsing the NIOSH standard as the appropriate litmus for safety, nor has it developed a preemption-related argument by way of citation to the relevant legal framework. In these circumstances, *606 judgment notwithstanding the verdict is not available on this claim.
Finally, Monsanto argues that Appellees failed to establish that its products are unreasonably dangerous, an essential prerequisite to a strict liability claim under Azzarello v. Black Bros. Co., 480 Pa. 547, 391 A.2d 1020 (1978). See Brief of Appellants at 62-64 (citing id. at 553-60, 391 A.2d at 1023-27). However, considering the extensive evidence concerning the properties of PCBs, including their susceptibility to dispersal and tendency to accumulate in humans subject to multiple exposures, as well as the expert evidence regarding their adverse human health effects (the admission of which is not challenged in this appeal) and the decision of Congress to ban the general manufacture and distribution of PCBs, see 15 U.S.C. § 2605(e), and taking into account Monsanto's assertion of its products' "miracle"-like utility, see Brief of Appellant at 63, we hold that the trial court did not err in submitting the product-defect claim to the jury.[20]

B. Damages
Monsanto subdivides its challenges to a retrial concerning Appellees' damages claims into attacks on the availability of compensation for costs associated with the Building's demolition and replacement; Building remediation and repair; replacement and repair of personal property; and relocation during the period of demolition and reconstruction.
i. Building demolition and replacementWith regard to the costs of demolition and replacement of the T & S Building, Monsanto argues that Appellees failed to offer expert testimony to the effect that the PCBs were incapable of being remediated and, relatedly, that the Building was permanently damaged beyond repair. More specifically, Monsanto asserts that no expert witness who testified at trial ever suggested that the total replacement approach taken by the Commonwealth was in any way necessary to the safety of Building occupants. Monsanto characterizes as unprecedented and inexplicable the trial court's holding that there is no need for expert testimony to support the causative aspect of a plaintiff's burden of proof relative to a potential award of full-value damages for destruction of a multi-million dollar office tower. In the absence of essential expert evidence regarding such causation, Monsanto advances the position that this damages claim never should have been submitted to the jury, and that the trial court compounded its error in allowing the claim to go forward by failing to award judgment notwithstanding the verdict. See Brief of Appellant at 39-42.
The trial court summarized the applicable law as requiring the presentation of expert testimony in circumstances in which the subject matter of an essential inquiry involves special skill and training beyond that possessed by lay persons. See U.S. Mineral Products, 809 A.2d at 1012 (citing Young v. Department of Transp., 560 Pa. 373, 376-77, 744 A.2d 1276, 1278 (2000)). Conversely, the court observed that expert evidence is unnecessary where the jury is capable of comprehending and understanding the essential facts and drawing appropriate conclusions. *607 See id. The trial court then proceeded to review Appellees' evidence, focusing on the testimony of Joseph Cocciardi, an environmental contractor retained by the Commonwealth in the aftermath of the fire, and Gary Crowell, who was the Secretary of DGS at the time that the decision was made to implode the T & S Building. As to Cocciardi, the trial court noted his finding of contamination throughout the building, and his anecdotal conclusion based on the experience of attempting to clean a passenger elevator that "cleaning would be, at least, a difficult process." Id. at 1012 (quoting N.T., May 24, 1999, at 205). With regard to Secretary Crowell, the trial court highlighted his testimony concerning continued experiences with areas of heavier PCB concentrations, and affirmation that the decision to demolish the Building was based on "the amount of contamination that was in that building, the risk that I thought it posed for the people who occupied that building, the people of the private sector who came in to do business in that building." Id. at 1011 (quoting N.T., June 1, 1999, at 14). More generally, the trial court made reference to testimony from several of Appellees' expert witnesses in support of its conclusion that a jury could reasonably conclude that the presence of PCBs in the T & S Building was both the cause in fact and the proximate cause of Appellees' claimed damages. See U.S. Mineral Products, 809 A.2d at 1011-12 (citing the testimony of William Ewing, an industrial hygienist, concerning widespread contamination in the Building; James Melius, a physician and epidemiologist, to the effect that remediation was necessary; and Richard Lemen, an epidemiologist, as to the risk associated with the Building in its condition prior to demolition).
We agree with Monsanto, however, that this evidence is insufficient to support an award of full-value damages in a building-contamination case. As previously noted, in repairable damage cases involving real property and associated structures, repair costs (capped by market value) constitute the general measure of damages. See Lobozzo, 437 Pa. at 361, 263 A.2d at 433. In addition, in special-use cases, the Court has suggested a willingness to accord lesser significance to the market-value delimiter. See supra. But, in all events, we will not eliminate the basic obligation on the part of those seeking to obtain compensation for property damage to establish that the repairs effectuated (or if the claim is of total destruction, the fact of the total loss) are fairly attributable to the defendant's conduct, product, or instrumentality giving rise to the liability. See generally Berkebile v. Brantly Helicopter Corp., 462 Pa. 83, 97, 337 A.2d 893, 900 (1975) ("`The plaintiff must ... prove that there was a defect in the product and that the defect caused his injury'" (citation omitted)). Here, the extent of the necessary remediation response to the chemical contamination of the Building was obviously a subject beyond the general experience of lay persons, and therefore, competent, relevant, expert evidence was required to inform the jurors' essential understanding. See Young, 560 Pa. at 376-77, 744 A.2d at 1278.[21]
*608 In this regard, Cocciardi's anecdotal references to "difficulties" associated with remediation efforts are insufficient  indeed, Cocciardi himself repeatedly testified that he never expressed the view that the PCBs could not be adequately remediated. See, e.g., N.T., August 18, 1999, at 10-11, 13. As to Secretary Crowell, he was not qualified to testify as an expert; moreover, he conceded that no person experienced with remediation of chemical contamination ever advised him that the Building could not be cleaned up. See N.T., June 8, 1999, at 250, 331. Furthermore, the trial court's citations to the expert evidence offered by Appellees' experts Ewing, Melius, and Lemen, do not touch on the efficacy of potential remediation efforts, but rather, merely go to the health impact of the existing contamination. See U.S. Mineral Products, 809 A.2d at 1011.[22]
By way of additional perspective, Appellees' own evidence suggests that the decision to demolish the Building was not made strictly based on an informed understanding that it was not possible (or economically feasible) to make it safe for human occupancy, but rather, was impacted by broader concerns, such as the stigma associated with the chemical contamination of a building. This is borne out, for example, in Appellees' questioning of Secretary Crowell, as follows:
Q: Let's look at the second page [of a transcript from a press conference]. It says, "The major consideration in these options were plan one considerations, abatement and cleanup. Plaza problems, leaks, et cetera, 30 year old building, gut building to exterior wall and structural steel, fill in floor distribution system with lightweight concrete. Distribution of electrical power from overhead. Lack of efficiency for space utilization. No matter what we do there would still be the lingering concern regarding the contamination in the building. And I would suspect that if we renovate and reoccupy the existing building, common aliments involving watery eyes, headaches, fevers, what have you, would be attributed to the building. I don't think we could ever overcome the perception of a sick building, and there would still exist the question of liability." Did I read that accurately.

A: Yes, you did.

Q: Is that what you said at the time?
A. That's what I said at the time.

*609 Q: And that's what you told the jury two days ago [in summarizing the reasons for demolishing the Building]?

A: Precisely.

N.T., June 8, 1999, at 283-84 (emphasis added); see also id. at 296 (reflecting Secretary Crowell's concern as to "whether people would ever feel comfortable"); cf. N.T., June 3, 1999, at 167-68 (reflecting Secretary Crowell's assertion: "My solution was if you got a problem and you want to get rid of the problem, you eliminate the problem, and then there's no more concern, and that's  and I just said implode the building."). While certainly other jurisdictions have found such stigma as it affects property value may be relevant to property-loss damages, see generally Martha A. Churchill, Diminished Property Value Due to Environmental Contamination, 33 AM.JUR. PROOF OF FACTS 3D 163, 177-79, 195-98 (1995), and this Court has not foreclosed such a theory, in the present case stigma was not relevant under the damages theory that was submitted to the jury. Rather, the trial court instructed the jurors that damages were to be gauged by the measures actually necessary to make the Building safe for human occupancy.[23] Appellees did not lodge a cross-appeal to challenge this limitation on available damages, and therefore, stigma-related recovery was not available, and Appellees' recovery hinged on the criterion of actual safety.
We hold that, in the circumstances of this case, since Appellees failed to offer expert evidence indicating that remediation of the PCBs in the Building to a degree that would make it safe for human occupancy was not possible or practicable (and, correspondingly that the Building was a total loss due to Monsanto's product), their presentation lacked an essential prerequisite to recovery of full-value damages. Accordingly, on this claim, the trial court should have awarded judgment notwithstanding the verdict in Monsanto's favor.
ii. Building remediation and repair  Monsanto also seeks judgment notwithstanding the verdict relative to an alternative damages theory that Appellees presented to the jury, predicated on a projected cost of $65 million to remediate the PCBs and to restore the Building to functional use. Monsanto complains that this theory was founded upon building demolition specifications that called for stripping the Building down to the structural steel, but no expert testified that remediation of PCBs for safe reoccupancy (as opposed to preparation for a safe implosion) *610 required such an extreme approach. See Brief of Appellees at 42-47.
As the trial court observed, however, Ewing, an industrial hygienist and expert witness for Appellees, testified that the procedures that were actually used to remediate the PCBs from the PennDOT building were "necessary to protect human health in the environment." N.T., May 20, 1999, at 316-17. Although Monsanto regards Ewing's statement in this regard as addressing only remediation necessary for the sake of the demolition, consistent with the principles governing review of a request for judgment notwithstanding the verdict, which require that this evidence be considered in the light most favorable to Appellees, with all reasonable inferences also accorded in their favor, see Adamski, 545 Pa. at 319, 681 A.2d at 173, we read Ewing's testimony as supportive of the notion that the actual and directed remediation measures that were effectuated were necessary, independent of whether or not total demolition would follow. While Monsanto also criticizes Ewing's experience, in light of his extensive history of serving as an expert witness in asbestos cases, it has not framed a specific challenge to the trial court's discretionary decision to admit his expert testimony concerning the need for PCB remediation. On this issue, therefore, we agree with Appellees that Monsanto's challenge can be viewed as an invitation to resolve credibility matters and weigh conflicting evidence, which is outside of our province on appellate review.
Monsanto also contends that, prior to the fire and the ensuing discovery of PCBs, the Commonwealth already had approved plans in place to strip the Building to its structural steel to remediate the asbestos hazard, as well as a well-developed intention to update all Building systems. Thus, Monsanto argues, full abatement of all contaminants would have occurred independent of the involvement of Monsanto's product. See Brief of Appellant at 45-46 n. 24. In support of this argument, Monsanto offers a chart collecting extensive, purported admissions by Appellees to the effect that full remediation was planned prior to 1994. See id. at Appendix, Table II.
The portions of the record summarized in this chart primarily reflect that the removal of asbestos was required; they do not, however, establish Monsanto's more general claim of an absolute overlap between essential PCB and asbestos remediation efforts. Moreover, substantial evidence of record reasonably supports the conclusion that the involvement of PCBs reposited in building materials and systems (including the asbestos fireproofing) substantially complicated the remediation efforts and increased the associated expense. See, e.g., N.T., May 20, 1999, at 311-16; N.T., June 24, 1999, at 222-30; N.T., August 11, 1999, at 111. Accordingly, Appellees sufficiently developed their claim that Monsanto's product was a substantial factor in causing their injuries, and, to the degree that the jury may have rested its verdict upon Appellees' off-gassing theory, the allocation of liability was within its province. Accord Powell v. Drumheller, 539 Pa. 484, 490, 653 A.2d 619, 622 (1995) ("[A] defendant is not relieved from liability because another concurring cause is also responsible for producing injury." (citations omitted)). Exclusive of the actionable defects in the trial discussed above, we find that the record developed in the trial court provided an adequate basis for the jury to perform the essential task of allocating liability and/or damages.
Monsanto also complains that, since the general rule is that repair costs are bounded by market value, see Lobozzo, 437 Pa. at 361, 263 A.2d at 433, and Appellees *611 introduced no evidence of the market value of the Building at trial, the repair-costs claim was legally insufficient to warrant presentation to the jury. In this regard, Monsanto cites Vogler v. Harrisburg Rys. Co., 85 Pa.Super. 483 (1925) (holding that a trial court erred in failing to award judgment notwithstanding the verdict on a claim for property loss associated with damage to a wagon, where there was no evidence from which the jury could determine the relationship between the cost of repairs and diminution in market value), and Freeman v. Maple Point, Inc., 393 Pa.Super. 427, 574 A.2d 684 (1990) (awarding a new trial in a construction-defect case in which the plaintiff failed to present evidence of diminution of market value).
As noted above, we have rejected Monsanto's argument that the Building cannot be considered a special-use property, and, with regard to such property, we will not foreclose the argument that, in appropriate cases, diminished market value should bear lesser significance relative to costs of repair in a damages assessment than in cases involving more fungible property such as the wagon in the Vogler case cited by Monsanto. In the present case, it is clear that Appellees were confronted with the need to implement substantial remediation relative to the PCB contamination in a public office building centrally located on the Capitol campus, and, to the extent that a fact finder could reasonably attribute liability to Monsanto under Appellees' offgassing evidence, we will not foreclose a new trial on the Building repair claim based on the absence of market value evidence.[24]
iii. Replacement and repair of personal property  Monsanto next claims that the trial court erred in failing to render judgment notwithstanding the verdict on Appellees' $12-million claim for the contamination-related loss of personal property, consisting primarily of soft-surface items such as upholstered furniture and work stations. See Brief of Appellant at 47-50.[25] Monsanto contends, inter alia, that Appellees improperly sought to recover full replacement value for such used, fungible, personal property.[26] Monsanto *612 distinguishes the personal property at issue here from the real property improvements that were the subject of Crea, complaining that, with respect to the former, there is not even a plausible basis in law to justify the recovery of full replacement costs.
Appellees, on the other hand, characterize Monsanto's argument as an effort to impose an arbitrary rule precluding recovery if a plaintiff cannot prove fair market value. Further, they underscore the trial court's citation to the general line of cases rejecting a rule which would require plaintiffs to establish their damages with absolute certainty, see U.S. Mineral Products, 809 A.2d at 1016. Appellees also cite to Pugh v. Holmes, 486 Pa. 272, 295-97, 405 A.2d 897, 909-10 (1979), arguing that in such case:
this Court searched for an approach to damages when fair market value could not be determined because there was no market for the property in question and where the cost to determine market value would be prohibitive. Pugh fashioned an approach which more closely reflected the actual injury suffered by the plaintiff. See also Pikunse v. Kopchinski, 429 Pa.Super. 46, 51-52, 631 A.2d 1049, 1051 (1993) (quoting Pugh to reject the defendant's argument that the failure to submit evidence of fair market value precluded recovery, and only requiring sufficient facts to permit an intelligent estimate of damages; if the defendant wishes to argue for a reduction in damages or to rebut the adequacy of plaintiff's evidence, that burden is on the defendant).
Brief of Appellees at 55-56.
Pugh, however, does not support Appellees' contention that they should be relieved from offering evidence of fair market value of personal property that they claim was destroyed by Monsanto's product.[27] Moreover, to the extent that such an argument was advanced and maintained by Appellees before the trial court, it was plainly rejected, as the jurors were clearly instructed that the measure of damages for personal properly loss was to be determined according to fair market value.[28] *613 Appellees have not filed a cross-appeal to challenge this limitation on the compensation available to them; therefore, such limitation is binding on them in this appeal. Finally, while Appellees repeatedly allude, in a highly generalized fashion, to some inability on their part to obtain market-value evidence, they offer no explanation as to why a personal-property appraiser could not have been retained to review this claim and offer an opinion to support Appellees' substantial, $12-million damages claim.[29]
As with our discussion of real property interests, above, we recognize that the cost of replacement of used personal property affords some measure of value, and that Appellees offered evidence at trial to the effect that the affected property was in good condition. We also remain mindful that some flexibility is available in favor of plaintiffs whose property has been injured by a defective product. Nevertheless, there must be some limit to tolerance in this regard. See generally Stevenson v. Economy Bank of Ambridge, 413 Pa. 442, 453-54, 197 A.2d 721, 727 (1964) ("This Court has held repeatedly that a claim for damages must be supported by a reasonable basis for calculation[.]"). For the present $12-million claim involving property used in a public office setting, we hold that the replacement-cost and current-condition evidence put forward by Appellees was insufficient to afford the jury a proper basis to determine value, and judgment notwithstanding the verdict should have been awarded on this claim. Accord Vogler, 85 Pa.Super. at 487.
Monsanto also complains that Appellees were improperly permitted to offer a $3-million claim seeking compensation for sampling of PCB contamination and cleaning items that were not discarded. Monsanto characterizes this claim exclusively as a repair claim and notes that the proper measure of damages for reparable injury to personal property is the lesser of the cost of repairing the property and its actual market value at the time of its destruction. See Vogler, 85 Pa.Super. at 486-87. Thus, as with the claim for the discarded personal property, fair market value is an essential aspect of Appellees' claim in this regard, and their failure to introduce evidence of fair market value renders the claim both defective and unavailable in a retrial setting. See Brief of Appellant at 50-51 ("When the plaintiff fails to introduce proof of market value, there is no factual basis upon which a jury may calculate the lesser of repair cost and market value," and here, "[Appellees] presented no testimony, expert or otherwise, as to the age, condition, or value of a single piece of `repaired' personal property.").
In response, Appellees cite to cases "where market value could not compensate plaintiffs for their loss," Brief of Appellees' at 56, but again, furnish no real explanation as to why market value could not compensate them for their loss in this case. On this point also, therefore, we find Monsanto's citation to Vogler to be highly relevant.
We offer no conclusion as to whether sampling or testing of contamination is fairly considered as a "repair" or whether *614 the related cost might more naturally fall within some different category of appropriate loss-related expenditures, since the only instruction given to the jurors that could encompass it here was the repair instruction. See supra note 23. Based on our reasoning that Appellees' evidence was insufficient to establish market value for personal property, and the essential role of actual value in determining fair compensation for personal-property repairs, we agree with Monsanto that Appellees' evidence was also deficient, and judgment notwithstanding the verdict is due in Monsanto's favor, on this claim as well. We distinguish this holding from our decision regarding the building repair and remediation claim on the basis of the special-use evidence that was offered relative to the latter, and the substantially more pronounced looseness of Appellees' evidentiary presentation concerning the personal property repairs claim.
iv. Relocation costs  Finally, Monsanto argues that Appellees' $55-million claim for relocation damages, representing their gross rental obligations spanning various five-to-seven-year leases that the Commonwealth negotiated for private office space to house the agencies that vacated the T & S Building during its demolition and the construction of the Keystone Building, should have been disallowed as a matter of law. According to Monsanto, as with the other PCB-related causation and damages issues, the likely and reasonable duration of any necessary PCB-related clean up was a question outside the range of an ordinary juror's experience and training, and expert testimony was therefore required.[30] Since Appellees failed to provide expert testimony that it would take between five and seven years to clean up PCBs from the Building, Monsanto asserts an entitlement to judgment notwithstanding the verdict on this relocation-costs claim. See Brief of Appellant at 51-52.
We have credited Monsanto's argument that the Building replacement claim was not properly presented to the jury and cannot be raised at a new trial. It follows that Appellees' claim for attendant damages in the form of lease costs encompassing the entire period of remediation, demolition, and construction of the Keystone Building cannot be fully sustained. As we have otherwise held, however, a new trial is available concerning the Building remediation-and-repair claim. See supra § III(B)(ii). While Appellees did not specifically correlate their loss-of-use presentation to such period, there is sufficient evidence of record from which the jurors could have defined the pertinent period and prorated damages accordingly, see, e.g., N.T., August 10, 1999, at 226-249, and the jury was in fact instructed of the obligation to adjust the lease expense according to its determination of the time attributable to necessary remediation. See N.T., August 10, 2000 (morning), at 109-12. Although we recognize that the state of the record concerning this loss-of-use claim is not ideal, we consider it sufficient for the present purposes of evaluating the availability of judgment notwithstanding the verdict. Our holding here is that the loss-of-use claim is not foreclosed in its entirety on retrial as a consequence of Monsanto's arguments in this appeal.

IV. The Remaining Claims
In light of our decision to direct the entry of judgment notwithstanding the verdict on various of Appellees' claims, and *615 a new trial on the balance of the claims, the remaining issues in the appeal (relative to asserted juror misconduct and delay damages) and in the cross-appeal (concerning delay damages) need not be addressed.
The order of the trial court is reversed, and the case is remanded for a new trial, with the proviso that judgment notwithstanding the verdict is due to be entered in favor of Monsanto relative to certain of Appellees' damages claims, in accordance with this opinion.
Chief Justice CAPPY and Justice CASTILLE and EAKIN join the opinion.
Justice NIGRO did not participate in the decision of this case.
Justice NEWMAN files a concurring and dissenting opinion in which Justice BAER joins.
Justice NEWMAN, concurring and dissenting.
I join the Majority Opinion in its resolution of Issues I and III. However, I respectfully dissent from the Majority's resolution of Issue II and its discussion and determination of strict liability as it applies to the instant matter.
In particular, the Majority concludes that, although a product-defect claim may be allowed based on the general danger of polychlorinated biphenyls (PCBs), a claim for strict liability is not permitted according to prior case law. Maj. Op. at ___, 898 A.2d at 600 (citing Phillips v. Cricket Lighters, 576 Pa. 644, 841 A.2d 1000, 1007 (2003) (plurality Opinion)). However, Phillips is not dispositive of this case as it addressed a legally distinguishable scenario. In particular, this Court in Phillips was concerned with the problem of a foreseeable but unintended user in strict liability cases. In an attempt to limit the scope of strict liability, this Court established that a child, as a foreseeable but unintended user, may not recover under a theory of strict liability when a lighter failed to have a child-safety lock. Id.
Presently, the issue does not involve an unintended user. Further, the Majority mistakenly attempts to equate unintended user with foreseeable misuse. Maj. Op. at ___, 898 A.2d at 600. However, the issue also does not center on foreseeable misuse. Rather, as discussed infra, the issue concerns the foreseeable conditions a product may face when used as intended by its intended user.
It is necessary to know the background in the confusing field of strict liability doctrine that has developed in this Commonwealth. Phillips discussed the doctrine in detail and highlighted some of the concerns with the present system. Although it is true that Phillips was highly critical of the then-existing strict liability doctrine, ultimately, there was no Majority to conclude that foreseeability considerations never have a place in a strict liability case. Instead, the overriding principle set forth in Phillips is that strict liability should be limited to a very small range of cases. In particular, Phillips merely garnered a Majority that agreed that cases involving an unintended user are outside the scope of the strict liability doctrine.
In evaluating the standards for strict liability, this Court, in Webb v. Zern, 422 Pa. 424, 220 A.2d 853, 854 (1966), adopted Section 402A of the Second Restatement of Torts (1965), which provides:
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and

*616 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
This Court has opined that a product will be deemed defective only if it "left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." Azzarello v. Black Bros. Co., 480 Pa. 547, 391 A.2d 1020, 1027 (1978). Phillips emphasized the intended user aspect by citing Mackowick v. Westinghouse Electric Corp., 525 Pa. 52, 575 A.2d 100 (1990) (holding that no claim for strict liability exists where there is a failure to warn of a danger well known to the intended user). "We reasoned that a product need be made safe only for its intended user." Phillips, 841 A.2d at 1005 (citing Mackowick, 575 A.2d at 102-03).
Phillips was a plurality Opinion from which it is difficult to discern a majority position regarding the application and exceptions to this Court's general restriction on recovery pursuant to a theory of strict liability. Moreover, all comments on precluding any expansion of strict liability were mere dicta that failed to garner a majority. In part, as noted by Justice Saylor's Concurring Opinion in Phillips, this is a result of the difficulty and artificiality in parsing negligence concepts from those of strict liability.[1]Phillips, 841 A.2d at 1016 (opining that "the Court should candidly address the ramifications, in particular, the overt, necessary, and proper incorporation of aspects of negligence theory into the equation.... I do not agree with the lead Justices that this question can be resolved by the rhetorical exclusion of negligence concepts from strict liability doctrine....") (Saylor, J., concurring, joined by Justices Castille and Eakin).[2] In addition, I wrote a Concurring and Dissenting Opinion in Phillips in which I stated, "[a]ccordingly, the majority properly rejected the strict liability claims in this case because the lighter was safe for its intended use by adults." Phillips, 841 A.2d at 1023. As such, I agreed that a child, as an unintended user, could not recover under a theory of strict liability. However, I did not address the issue of an intended user. Instead, I concluded that "[m]anufacturers, distributors, and sellers have a duty to provide products that are not unreasonably dangerous when operated as intended by their intended users." Id. at 1024.
Importantly, the case at hand involves neither an unintended user nor an unintended *617 use.[3] Rather, the building material was used in the construction and maintenance of a building, per its intended use, and the intended user, the owner of the building, used the materials. The Majority states that "[a]s it is undisputed that the incineration of building products is not a use intended by the manufacturer ... damages in strict liability are unavailable for the fire-related contamination." Maj. Op. at ___, 898 A.2d at 604. Although it is true that subjecting building products to fire is not a use intended by the manufacturer, this is not a case of misuse by the user. Instead, the product was used in the manner for which it was designed, but was exposed to the easily anticipated conditions to which any building material, properly used, may be subject.
As such, this case is readily distinguishable from the concerns present in the Lead Opinion in Phillips regarding the oft-misplaced foreseeability argument in strict liability cases. The instant scenario is more akin to a "crashworthiness doctrine" situation than to Phillips. As noted by the Majority, the Third Circuit predicted that this Court would adopt the crashworthiness doctrine relative to vehicle manufacturers. Maj. Op. at ___, n. 10, 898 A.2d at 601, n. 10 (citing Oddi v. Ford Motor Co., 234 F.3d 136, 143 (3d Cir. 2000)); see also Hutchinson v. Penske Truck Leasing Co., 876 A.2d 978, 983 (Pa.Super.2005) ("The crashworthiness doctrine is a subset of strict products liability, most applicable to vehicular accidents. By this doctrine, the liability of manufacturers and sellers is extended to situations where the defect did not actually cause the injury-producing accident, but rather led to an increase in the severity of the injury incurred.") (citing Colville v. Crown Equip. Corp., 809 A.2d 916, 922 (Pa.Super.2002), appeal denied, 574 Pa. 742, 829 A.2d 310 (2003)); Harsh v. Petroll, 840 A.2d 404 (Pa.Cmwlth.2003), appeal granted, 580 Pa. 546, 862 A.2d 581 (2004), ("A subset of both the design defect and the manufacturing defect claims is what is known as the `crashworthiness' claim which Plaintiffs did not specifically raise, but which is an aspect of strict liability.") *618 (citing Kupetz v. Deere Co., 435 Pa.Super. 16, 644 A.2d 1213, 1218 (Pa.Super.1994), appeal denied, 539 Pa. 693, 653 A.2d 1232 (1994)). Colville summarized the crashworthiness doctrine well in stating:
Historically, a Section 402A strict products liability action only created liability for injuries proximately caused by a defect where the defect also caused the accident. Barris v. Bob's Drag Chutes Safety Equipment, Inc., 685 F.2d 94, 99 (3rd Cir.1982). However, the crashworthiness doctrine extends the liability of manufacturers and sellers to situations in which the defect did not cause the accident or initial impact, but rather increased the severity of the injury over that which would have occurred absent the design defect. Kupetz, 435 Pa.Super. 16, 644 A.2d 1213, 1218 (Pa.Super.1994) (citing Mills v. Ford Motor Co., 142 F.R.D. 271 (M.D.Pa.1990)).
Colville, 809 A.2d at 922 (citations modified). In summary, the crashworthiness doctrine is an exception to the general prohibition of strict liability for intended use.
The underlying reasoning for the exception is that the intended use of a vehicle is not to crash it; but instead to use it safely without accident. However, the majority of jurisdictions that have addressed the crashworthiness doctrine have been persuaded by the rationale that an intended user who uses the product in its intended fashion may still be involved in a crash through no fault or misuse of his or her own. The crashworthiness doctrine permits strict liability as a means of ensuring that automobile manufacturers create a product that is safely designed for its purpose, including foreseeable conditions that do not involve misuse on the part of the user. Those same considerations exist in a case such as this one; namely, that the producer of building materials designs a product that is inherently safe when used as intended by the intended user and foreseeable misfortune occurs through no fault of that user. Ultimately, the defect is one that increases the severity of the injury due to a foreseeable outside cause or instigator of the injury. This is not a situation where the user intentionally or unintentionally was the direct cause of the injury, and I do not profess to address a scenario where a user has intentionally set the material on fire. In contrast, this is a situation where the inherent defect increased the severity of the injury through no fault or misuse on the part of the intended user.
The Majority asserts that Phillips foreclosed the expansion of strict liability and that to allow the present claim to be subject to strict liability would be to expand the doctrine. Maj. Op. at ___, 898 A.2d at 600-01. The Majority notes that both Oddi, supra., and Davis v. Berwind Corp., 547 Pa. 260, 690 A.2d 186, 190 (1997) (holding that a manufacturer may be held strictly liable for foreseeable alterations to an otherwise safe product), allow for some targeted exceptions to this limitation on strict liability. Id. at 15, n. 10. The present matter is akin to the crashworthiness doctrine in Oddi and would not be an expansion of the existing, limited applicability of the doctrine of strict liability.[4]
Moreover, the Majority states that:

*619 While Justice Newman's threshold proposition may be accurate as concerns Phillips, it fails to account for prior majority decisions of this Court that have based their holdings squarely on the proposition that negligence concepts have no place in strict liability doctrine. See, e.g., Kimco Dev. Corp. v. Michael D's Carpet Outlets, 536 Pa. 1, 7-9, 637 A.2d 603, 606-07 (1993) (predicating a holding that manufacturers may not assert a comparative negligence defense in strict liability cases on the notion that negligence concepts do not properly extend into the strict liability arena).
Maj. Op. at ___, 898 A.2d at 602; see also Maj. Op. at ___, 898 A.2d at 602 (summarizing Kimco as stating "that negligence concepts have no place in strict liability theory to justify substantial restrictions on use-related defenses in strict liability cases, by prohibiting manufacturer defendants from pursuing a comparative negligence defense based on the plaintiff's conduct.") Kimco is entirely consistent with my proposed holding today. In Kimco, a manufacturer was not allowed to rely on misuse on the part of the defendant to receive a reduction in damages based on comparative negligence. The foam product was defective in that it was flammable and could be placed near sources of heat. Thus, the doctrine of foreseeable misuse was not implicated, as that is part of an analysis of negligence and not one of strict liability. Kimco allowed for strict liability recovery when a product was used as intended by its intended user under foreseeable conditions. Moreover, the defendant in Kimco was estopped from asserting a comparative negligence claim because the product was used as intended even if subjected to questionable, yet foreseeable, conditions. Presently, the defendant should also not be allowed to assert a comparative negligence claim of foreseeable misuse. Much as in Kimco, the material was used as intended and subjected to foreseeable conditions that resulted in harm. Accordingly, Kimco supports the proposition that misuse never plays a role in strict liability; it is foreseeable conditions of intended use, even if negligent on the part of the end-user, that may still subject a manufacturer to strict liability.
Thus, I find that, under current strict liability law, a colorable strict liability issue exists for the jury in a case such as this. Namely, when a product is used by its intended user (building owner) and for its intended use (in the construction and maintenance of a building), a question exists as to whether or not the product was "lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." Azzarello, 391 A.2d at 1027; Second Restatement of Torts. The jury has already made a determination pursuant to strict liability standards involving the foreseeable conditions to which the product used in its intended way may be subjected. As such, I would hold that no new trial is necessary concerning liability. However, a remand is needed on issue II to determine the damages caused by the product defect. In particular, the jury must distinguish non-compensable injury that would have occurred absent the product defect from the enhanced and compensable harm resulting from the product defect. See Kupetz v. Deere & Co., 435 Pa.Super. 16, 644 A.2d 1213 (Pa.Super.1994); Colville, supra. Ultimately, though, because I concur with the Majority Opinion regarding Issues I and III, I agree that a new trial is warranted on those grounds.
Justice BAER joins this concurring and dissenting opinion.
NOTES
[1] Although DGS, PennDOT, the PUC, PEMA, and the Department of State are also cross-appellants relative to one question presented, for the sake of convenience, we will refer to them as "Appellees" throughout.
[2] Summary judgment was awarded in favor of several other co-defendants, however, and the others, including U.S. Mineral Products, received favorable verdicts at trial.
[3] In this regard, Monsanto emphasizes that the extensive environmental testing throughout the two-and-one-half years after the fire generally confirmed that PCB levels in occupied areas of the Building were below legally-enforceable safety standards set by the United States Environmental Protection Agency and the Occupational Safety and Health Administration, and that DGS and the Pennsylvania Department of Health repeatedly announced during this period that PCB levels were negligible and presented no health risk to employees.
[4] Monsanto notes that several of this Court's decisions prior to Lobozzo had advanced the proposition, commonly applied in a number of other jurisdictions, that the general measure of damages for reparable harm to realty is the lesser of the repair costs or the diminution in market value caused by the defendant's conduct, product, or instrumentality. See Brief of Appellant at 27 n. 12, 46-47 & n. 26. Monsanto's argument suggests the colorable position that Lobozzo's formulation bounding costs of repair by full market value (as opposed to diminution in market value) is not grounded in legal reasoning developed by the Court, but rather, appears to stem from a misreading of the seminal decision in Rabe v. Shoenberger Coal Co., 213 Pa. 252, 62 A. 854 (1906), which first occurred in Jones v. Monroe Elec. Co., 350 Pa. 539, 39 A.2d 569 (1944), and has been perpetuated in subsequent cases. Nevertheless, Monsanto also maintains that resolution of this apparent conflict is not necessary to the disposition of this appeal, see Brief of Appellee at 27 n. 12, 46 n. 26, and accordingly, there is no need to consider it further here.
[5] Along these lines, in the eminent domain arena, the General Assembly has codified an approach that permits special uses or purposes to be taken into account in determining valuation and achieving fair compensation. See 26 P.S. § 1-603 (CommentJoint State Government Commission) (observing that the Eminent Domain Code provides for "proper valuation of special use properties"); accord Redevelopment Auth. of Phila. v. Lieberman, 461 Pa. 208, 221-22, 336 A.2d 249, 256 (1975).
[6] Monsanto asserts that compensation based on replacement costs was unavailable as a specific measure of damages in this case under Crea as a matter of fact, since the T & S Building had an ascertainable market value. In this regard, Monsanto notes that other buildings situated on the Capitol campus are privately owned and/or have been appraised, sold or exchanged in the past, see, e.g., N.T., February 29, 2000, at 190-94; private offers were made to purchase the structure even in the aftermath of the fire, see, e.g., R.R. at 3075a-3090a; and various Commonwealth representatives had expressly contemplated the option of privatizing the T & S Building. Monsanto also observes that the trial court's reliance on the need for legislative pre-approval of a sale is not persuasive, since such approval is not greatly distinguishable from the necessity for obtaining authority from a board of directors for sale of a building owned by a corporation and has nothing to do with the availability or non-availability of willing buyers. Furthermore, Monsanto complains that the trial court's logic would render all similarly-situated Commonwealth buildings valueless. Moreover, according to Monsanto, the Building's amenability to conventional market valuation has been conceded by Appellees in the present briefing. See Brief of Appellees at 44 ("The Agencies were prepared to put a dollar amount on the value of the T & S Building[.]").

This Court, however, has not categorically and immutably confined special-purpose valuation and/or the relevance of replacement or reproduction costs to instances in which market valuation is impossible. Cf. Romesberg v. Caplan Iron & Steel Co., 385 Pa. 36, 39, 122 A.2d 53, 54 (1956) (directing that damages for wrongful demolition of a building dedicated to crushing stone were to be calculated based on the "cost of restoration of the structure to its condition immediately before the demolition began"). On this point, we agree with Appellees' position that, in light of the unique attributes of the T & S Building, chief among which are its public purposes and location on the Capitol campus, the structure could fairly be deemed by a fact finder to represent a special-purpose property.
[7] We use depreciation here in the same manner as it is used in the application of the cost approach to real-property valuation, as encompassing the effect of "all factors that make the particular structure worth less than its replacement or reproduction cost new, including physical deterioration, faulty design and other deficiencies of the structure, and changes in the external environment and economic conditions." Daniel F. Sullivan, Valuation of Structure Based on Reproduction or Replacement Cost, 8 AM.JUR. PROOF OF FACTS 2D 399, 429 (1976).
[8] The Pennsylvania decisions addressing construction costs appear to reflect an approach more closely tied to "reproduction" rather than "replacement" costs, as these terms are utilized in the arena of real estate appraisal. See generally Sullivan, Valuation of Structure Based on Reproduction or Replacement Cost, 8 AM.JUR. PROOF OF FACTS 2D at 408 (distinguishing such costs as follows: "Reproduction cost is the current cost of constructing a replica of the structure, using the same or closely similar materials[;][r]eplacement cost is the current cost necessary to construct an improvement of the same functional utility as the original one, but using current practices in construction design and choice of building materials."). Frequently, however, replacement costs are lower than reproduction costs, given efficiencies associated with modern construction methods, and therefore, may yield the more reasonable assessment of a loss. See id. Nevertheless, in a situation in which replacement costs are substantially greater than reproduction costs, as the evidence indicated in this case, see N.T., July 13, 1999, at 145, the replacement cost figure may not be a fair indicator of just compensation, and obviously, where such costs are deemed to bear relevance to damages, substantial adjustments are implicated.
[9] In their brief, Appellees observe (albeit subject to dispute by Monsanto) that they did not include "upgrades" associated with the Keystone Building, such as its helipad and fire suppression system, within their damages calculations. Accord N.T., June 8, 1999, at 299. However, this at best accounts for a few, discrete, selected improvements, but does little to address the depreciation aspect on a comprehensive basis. Since the evidence concerning the degree of depreciation substantially diverged, although certainly the jurors would have been free to assign a monetary amount to depreciation based on their resolution of the conflicts, they should have been directed that depreciation was to be considered by them in arriving at a verdict.
[10] The Court has recognized that there are limited, targeted exceptions to this approach that have arisen in the case law. See, e.g., Davis v. Berwind Corp., 547 Pa. 260, 267, 690 A.2d 186, 190 (1997) (indicating that a manufacturer may be held strictly liable for subsequent changes to an otherwise safe product, where such alterations are reasonably foreseeable); cf. Oddi v. Ford Motor Co., 234 F.3d 136, 143 (3d Cir.2000) (predicting that this Court would adopt the crashworthiness doctrine relative to vehicle manufacturers). As developed below, however, the prevailing consensus in Phillips was that there would be no further expansions under existing strict liability doctrine.
[11] Obviously, our present discussion does not address a situation in which a defect in the building materials is the cause of combustion occurring during their ordinary use.
[12] Like the trial court's charge and opinion, Appellees' argument on this point is couched specifically in terms of foreseeability. See Brief of Appellees at 32 ("A fire is clearly foreseeable."), 33 ("The issue of foreseeability is for the jury, and if the jury found that the fire was foreseeable, Monsanto is liable."), 33 ("[T]he jury evaluated the evidence to determine whether the potential fire should be considered reasonably foreseeable.").
[13] Justice Newman attempts to address this difficulty in her analysis by proposing that the issue of injury enhancement can be addressed in this case via a remand limited to a new determination of damages. See Concurring and Dissenting Opinion, op. at ___, 898 A.2d at 619 (Newman, J.). Both of the cases that she references in support of such an approach, however, recognize that the enhanced harm concept is central to the liability determination in the first instance under crashworthiness theory. See Kupetz, 435 Pa.Super. at 26-28, 644 A.2d at 1218; Colville v. Crown Equip. Corp., 809 A.2d 916, 922-23 (Pa.Super.2002).
[14] The position that contamination-related harm occasioned by incineration of a product should be viewed as occurring within the product's intended use so long as the product was being used as intended (for example, as a dormant building product) at the time that it was destroyed is an awkward one, both semantically and conceptually. Indeed, the responsive opinion ultimately recognizes that crashworthiness doctrine (upon which its conclusions are grounded) functions as an exception to the intended use requirement, as opposed to a logical corollary. See Concurring and Dissenting Opinion, op. at ___, 898 A.2d at 618 ("In summary, the crashworthiness doctrine is an exception to the general prohibition of strict liability for intended use [sic].").
[15] What happened in Phillips is not that there was an effort on the part of the lead opinion to alter existing doctrine, as Justice Newman appears to posit. In fact, the lead opinion in Phillips accurately cited and applied such doctrine verbatim. Rather, in Phillips, a plurality of the Court, viewing the condition of Pennsylvania strict liability doctrine as impaired, advocated reform in a case that it acknowledged was not a ready vehicle for effecting such a change. See Phillips, 576 Pa. at 670-75, 841 A.2d at 1015-18 (Saylor, J., concurring). The rationale of this concurrence was not that there was no precedent for the proposition that negligence concepts have no place in the strict liability context; rather, the reasoning was based on the belief that such clear precedent was in tension with other aspects of Pennsylvania strict liability doctrine, including the product alteration and crashworthiness cases. See id.
[16] Justice Newman undertakes to develop the particular facts of Kimco to suggest that they can be squared with her theory of a conditions-of-use/outside-cause-or-instigator exception to the bar against resort to negligence concepts in strict liability actions. See Concurring and Dissenting Opinion, op. at ___-___, 898 A.2d at 618-19 (Newman, J.). While perhaps this may be true, Kimco's rationale certainly cannot be reconciled with Justice Newman's theory, because the decision's reasoning was specifically grounded on the propositions that "negligence concepts have no place in a strict liability action," and that "the underlying purpose of strict liability is undermined by introducing negligence concepts into it." Kimco, 536 Pa. at 8, 637 A.2d at 606.
[17] Notably, in distinguishing the child-play fire scenario, Justice Newman indicates that the present circumstances involving PCB contamination throughout the T & S Building represent "a situation where the inherent defect increased the severity of the injury through no fault or misuse on the part of the intended user." Concurring and Dissenting Opinion, op. at ___, 898 A.2d at 618 (Newman, J.). In fact, and as noted, Monsanto presented evidence that the Commonwealth's failure, inter alia, to install a fire suppression system to protect the building and its contents and occupants consistent with the local fire code represented a misuse that caused the complained of injury. Furthermore, over Monsanto's objection, the trial court refused to issue a misuse instruction relative to causation. Compare Proposed Jury Instructions of Defendant Monsanto Company, at 32 ("One of the factors you may consider [in assessing proximate causation] is plaintiffs' own conduct, and what role, if any, it had in causing plaintiffs' alleged damages. In that regard, you may consider whether plaintiffs misused the products in question, and whether plaintiffs' conduct was highly reckless."), with N.T., August 10, 2000, at 91-95 (reflecting no product misuse aspect among the trial court's instructions regarding proximate causation). We disagree, therefore, with Justice Newman's assertion as a matter of fact that there was no fault or misuse on the part of the Commonwealth, since there was conflicting evidence offered on this point at trial, and the jury was not asked to take the matter into account in rendering a verdict. Moreover, the inextricable entanglement between the intended use criterion and the conditions-of-use/outside-cause-or-instigator rubric employed in the responsive opinion illustrates the inherent unworkability of the distinction that it proposes.
[18] See, e.g., N.T., May 17, 1999, at 120; N.T., May 20, 1999, at 303; N.T., May 24, 1999, at 213-14; N.T., May 25, 1999, at 58, 60; N.T., June 10, 1999, at 37-38; N.T., August 11, 1999, at 79.
[19] See, e.g., N.T., May 17, 1999, at 118, N.T., May 21, 1999, at 98, 110-12; cf. N.T., May 24, 1999, at 221, 226.
[20] In this appeal, Monsanto has not presented a claim for relief attacking the trial court's exercise of its discretion in permitting Appellees' theory to be presented to the jury that the primary PCB contamination for which compensation was sought resulted from long-term volitization via off-gassing from ductwork, as opposed to the consumption of PCB-containing building materials in the June-1994 fire. Our discussion, above, therefore, must assume that the trial court acted within its discretion in this regard.
[21] Citing Kozak v. Struth, 515 Pa. 554, 531 A.2d 420 (1987), Appellees contend that it would have been improper for their experts to testify to an ultimate issue in the case such as causation. See Brief of Appellees at 37. Kozak, however, involved circumstances in which an expert had been called upon improperly to comment on the totality of the evidence, including the credibility of fact witnesses, thus resolving conflicts in the testimony in a way that supplanted the jurors' function. See Kozak, 515 Pa. at 559-63, 531 A.2d at 422-24. The decision in no way relieves Appellees from the well-established requirement to present expert testimony concerning the subject matter of essential inquiries involving special skill and training beyond that possessed by lay persons.
[22] In their brief, Appellees' offer additional citations to the record to support the proposition that "despite great efforts, the building could not be cleaned." See Brief of Appellees at 5, 38. The citations are to the testimony of Secretary Crowell (who was not offered as an expert witness) and Appellees' damages expert, Jack Halliwell. Like Cocciardi, however, Halliwell also did not testify that the PCBs in the Building could not be remediated, or that wholesale replacement was required (on the pages referenced by Appellees, the thrust of Halliwell's testimony was that certain wiring raceways underneath the concrete flooring had to be abandoned and replaced by a substitute system. See N.T., July 28, 1999, at 134-37; August 11, 1999, at 78-81). Appellees' present assertion that Halliwell's testimony goes to causation is also inconsistent with various representations they made to the trial court during the course of trial in their attempts to secure Halliwell's qualification as an expert witness. See, e.g., N.T., June 29, 1999, at 236, 337 (reflecting the representation of Appellees' counsel that "all [Halliwell] is offering the opinion of what the contracts cost to abate the PCBs from the building pursuant to the specifications[,] ... [a]nd subsequently what did it cost either to build a new building, assuming Mr. Crowell was right, he needed to implode it, or, number two, assuming the defendant is right and you only needed to clean it to a level of 10.").
[23] In this regard, the trial court charged the jurors:

As against Monsanto, plaintiff must show, by credible, scientific expert evidence, that the levels of PCBs in the T & S Building were such as to make the building unsafe for human occupancy. Plaintiffs cannot meet their burden of proof merely by showing that PCBs were in the T & S Building.
* * *
In determining the damages, if any, on [Plaintiff's claim that PCBs in the T & S Building made the Building unsafe for human occupancy], you must determine, based possible [sic] the credible scientific evidence, whether the PCBs in the T & S Building could have been cleaned up to a level which made the building safe for occupancy. If you find that the PCBs could have been cleaned up, assuming plaintiffs have proven that any clean up was necessary, to a level which made the building safe for occupancy, then the measure of damages for property damage to the T & S Building would be the lesser of the reasonable cost of cleaning up the PCBs or decrease in market value caused by the presence of PCBs.
N.T., Aug. 10, 2000, at 93, 104-05. Parenthetically, as it concerns the market-value limitation on repair costs in a real-property-improvements case, this instruction reflects the law as delineated in Rabe, but which was supplanted by Lobozzo. See supra note 4.
[24] The decisions in Lobozzo and Freeman also appear to reflect some latitude on the part of Pennsylvania courts in terms of plaintiffs' proofs concerning the market-value boundary relative to repair costs. See Lobozzo, 437 Pa. at 368-69, 263 A.2d at 436-37 (holding, in a building repair case in which the only testimony concerning damages was introduced by the plaintiff's witness who gave estimates of the cost of repairs, that the court below nevertheless justifiably concluded that the value of the building exceeded the cost of repair); Freeman, 393 Pa.Super. at 432-33, 574 A.2d at 686-688 (awarding a new trial, but not judgment notwithstanding the verdict, in a construction-defect, building-repair case in light of a plaintiff's failure to offer market-value evidence). On a cautionary note, however, we do not read these cases as altering the appropriate measure of damages, but rather, merely observe that they are consistent with our decision here to award a new trial as opposed to judgment notwithstanding the verdict on the Building repair-and-remediation claim.
[25] Appellees had originally sought replacement costs for both hard- and soft-surface building contents. Because, however, Appellees' witnesses affirmed that all hard-surface items could have been cleaned up, see N.T., June 17, 1999, at 98, the trial court granted a directed verdict as to those items. See N.T., August 10, 2000, at 107-08.
[26] Monsanto also contends that, with regard to items claimed to have been a total loss, Appellees offered no evidence of irreparable injury. See Brief for Appellant at 48-49. In denying relief on this claim, the trial court relied upon Appellees' evidence that soft-surface items were irreparably damaged in the process of testing them for PCB contamination. See U.S. Mineral Products, 809 A.2d at 1016-17. In light of our disposition, below, we need not further evaluate the trial court's reasoning on this point.
[27] The damages-related portion of Pugh is centered on the inherent difficulties in quantifying rent abatement in compensation for landlord breach of the implied warranty of habitability, and the discussion expressly entails consideration of special circumstances confronting low-income tenants. See Pugh, 486 Pa. at 295-97, 405 A.2d at 909-10. Accordingly, the holding in the case has little relevance to the comparatively straightforward matter of personal property valuation. The Pikunse decision also lacks relevance, as it concerns a conversion claim entailing circumstances in which the defendant's conduct foreclosed the plaintiff's ability to obtain an appraisal. See Pikunse, 429 Pa.Super. at 51-53, 631 A.2d at 1051-52. Here, it is undisputed that Appellees (or, more generally, the Commonwealth) controlled their property at all relevant times.
[28] The relevant instruction proceeded as follows:

In order to recover on these claims, plaintiffs must prove these things to you as to each item for which they claim damage: First, that each soft surface item contained PCBs or asbestos at unsafe levels so as to require clean up; second, the costs of such clean up and third, a reasonable basis for calculating the market value, given its age and condition. Under Pennsylvania law the measure of damages for furniture, equipment, office supplies and other such items is the lesser of the cost of repair, that is, to clean up the item, and the market value of the item at the time of damage, given its age and condition. Pennsylvania law does not allow for the cost of replacement for such items.
N.T., August 10, 2000 (morning), at 108-09; accord Denby v. North Side Carpet Cleaning Co., 257 Pa.Super. 73, 82, 390 A.2d 252, 256 (1978) (explaining that, where harm to personal property is irreparable, fair compensation is assessed in accordance with the actual value of the property at the time of the destruction, given its age, condition, and salvage value).
[29] It is also noteworthy that, despite the charge that the trial court had selected relative to personal property valuation, Appellees' counsel made no effort to couch his valuation presentation to the jurors in fair-market-value terms. See N.T., August 8, 2000, at 233-34 ("[S]o it was more cost efficient to replace [soft-surface items] than it was to attempt to clean them and to test them. So the personal property for the Department of Transportation was $14 million. $14,403[,000].").
[30] Monsanto does not contend that loss-of-use damages are unavailable as a matter of law in a strict liability case.
[1] Notably, because Phillips had only six participating Justices, this Concurring Opinion garnered the support of half the Court and squarely recognized that negligence principles currently exist in a limited manner in strict liability doctrine.
[2] In addition, Justice Saylor wrote that this Court should consider the reasoned approach of the Third Restatement of Torts: Products Liability § 2 (1998). Id. at 1019-20 (utilizing a risk-utility test). As in Phillips, an argument concerning the Third Restatement of Torts is not before us. I recognize the apparent and possible appeal in the more progressive approach adopted by the Third Restatement, in particular, in cases such as this involving a known dangerous chemical where a risk-utility test would be a just measure of a manufacturer's liability for the product. However, I will proceed to analyze the present matter pursuant to our existing caselaw and the Second Restatement of Torts.
[3] The Majority misreads and mischaracterizes this central line of reasoning in this Opinion. In no way have I proposed that an alteration to existing case law be adopted by allowing reasonably foreseeable unintended use to enable recovery pursuant to a theory of strict liability. As emphasized throughout my Concurring and Dissenting Opinion, the building materials in this case were used as intended by the intended user. The ability to recover may exist only if these two prerequisites are met. Azzarello, supra. When a manufacturer designs a product that must be safe for its intended user and intended use, common sense dictates that such safely intended use must include all reasonably foreseeable conditions and events affecting that intended use. Thus, a sense of fair play to the innocent consumer mandates that recovery is allowable pursuant to a theory of strict liability. Moreover, as the materials were used in their intended fashion by their intended user, no prior case law in this Commonwealth precludes recovery. Rather, the Majority appears to equate foreseeability of conditions of intended use with foreseeable misuse. Maj. Op. at ___, 898 A.2d at 600 ("Madame Justice Newman posits that the Court should extend the liability without fault of manufacturers, beyond the realm of injuries occasioned in the actual course of the use of a product as the manufacturer intended, to injury or damage occasioned by exposure of a product to some unintended but reasonably foreseeable condition of use or `outside cause or instigator.'") (citing Concurring and Dissenting Op., Newman, J. at ___, ___, ___, ___ _ ___, 898 A.2d at 615, 617, 618, 618-19). In reality, the two are distinguishable; namely, the product was used as intended and, thus, the negligence doctrines of "foreseeable misuse" and "foreseeable unintended user" are not implicated. Accordingly, I would find that: (1) it is those negligence concepts that have no place in strict liability; and (2) foreseeability may play a role in determining the conditions to which a product may be subjected when used as intended.
[4] The Majority opines, "we are of the view that the metamorphosis of the particularized crashworthiness doctrine into a generalized conditions-of-use/outside-cause-or-instigator exception to the general bar against resort to foreseeability concepts in the strict liability arena would, in fact, represent an extension of the type that was disapproved by a majority of Justices in Phillips." Maj. Op. at ___ _ ___, 898 A.2d at 602. The application of the crashworthiness doctrine to this matter is not an extension; rather, it is a necessary logical corollary and mere formalization of the implied existence of the crashworthiness doctrine in Pennsylvania.